IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID "ROLLIN.LOW.374" THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. MJ 18-27-GF-JTJ<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Albert W. Kinsey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. I am a Special Agent of the Department of Homeland Security, Homeland Security Investigations (HSI) and an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18.

3. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I have been a Special Agent since 2001. Since that time, and as part of my official duties, I have participated in the investigation of narcotics trafficking, money laundering, complex conspiracies, and among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants and reviews of taped conversations. Through my training, education, and experience, I have become familiar with the manner in which narcotics traffickers and money launderers conduct their operations, including but not limited to, their methods of importing and distributing controlled substances, use of telecommunication devices to include cellular telephones and digital display paging devices, use of counter surveillance techniques, and use of numerical codes and coded and/or cryptic language, words, and references to conduct their transactions.

2

4. I have completed numerous courses of formal instruction given by HSI and other agencies related to narcotics and financial investigations, including courses on narcotics trafficking, money laundering, and complex conspiracies. I have participated in and led investigations resulting in the arrest of numerous drug trafficking suspects, and in the seizure of substantial quantities of illegal narcotics and proceeds of narcotics sales.

5. I have participated in investigations involving the interception of wire communications and the use of video surveillance. I am familiar with the manner in which narcotics traffickers and money launderers conduct their operations, including but not limited to, their methods of importing and distributing controlled substances, use of telecommunication devices to include cellular telephones, use of counter surveillance techniques, and use of numerical codes and coded and/or cryptic language, words, and references to conduct their transactions.

6. As part of my duties as a HSI Special Agent, I have participated in long-term historical conspiracy investigations, as well as Organized Crime and Drug Enforcement Task Force (OCDETF) investigations targeting international drug traffickers. I have testified in federal judicial proceedings. I have been involved in the debriefing of defendants, witnesses and informants, and others who know about the distribution and transportation of controlled substances, money

laundering, and the concealment of proceeds derived from drug trafficking. Further, I have conducted or participated in physical surveillance, electronic surveillance, undercover transactions, and the execution of arrest and search warrants in numerous narcotics investigations.

7.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846 have been committed by Roel CENTENO. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

9.     On March 2, 2018, HSI received a request for assistance from the Great Falls Police Department (GFPD) concerning a possible human trafficking investigation at the Extended Stay Hotel in Great Falls, Montana. Employees at the Extended Stay Hotel had received training in identifying signs of human trafficking and they contacted police after they observed what they believed was

4

human/child trafficking occurring in room #225 and #227. Employees at the Extended Stay attempted to investigate their concerns and knocked on the door to room #227. A female answered the door and employees observed what they believed was a Hispanic female in the room who was under the age of 18 who only spoke Spanish. Employees told detectives that a Hispanic male, identified as Michael Laird, had rented rooms #227 and #225. Laird was the only person listed on the registration for room #227, and Laird informed employees at the hotel that he was the only occupant of the room.

10. Due to concern for the female that employees had seen in the room, once officers arrived at the hotel, they entered room #227 but no one was present in the room. GFPD officers and your affiant then knocked on the door to room #225 and met with the occupant, identified as Roel CENTENO. Law enforcement learned CENTENO had a significant criminal history, including prior drug convictions, and is prohibited from possessing any firearms. During the search for the female in room #225, officers observed gun cases in plain sight, as well as a rifle under the bed in room #225.

11. Pursuant to this information, GFPD Detective Jesse Slaughter obtained two state district court search warrants authorizing the search of rooms #225 and #227. During these searches, law enforcement seized approximately

5

11.26 pounds of methamphetamine, 7.3 ounces of heroin, and $35,000 in U.S. currency. Law enforcement also seized two vehicles, one of which was outfitted with two non-factory false compartments, nine firearms with some of the serial numbers visibly removed, magazines, ammunition and numerous cellular telephones. Law enforcement arrested CENTENO and Carolina RAMIREZ. RAMIREZ was identified as the owner of the vehicle with the two non-factory false compartments.

12. Your affiant interviewed CENTENO who provided information on the smuggling of drugs from California to Montana. CENTENO provided your affiant with the names of Michael Laird and Greg Denny, and said both men were involved in the sale of methamphetamine in Great Falls and the Rocky Boy's Indian Reservation. CENTENO explained Denny owed Laird money from prior drug shipments. CENTENO also observed Denny provide Laird with a small automatic style pistol that had purple on the grips in exchange for a drug debt. On March 2, 2018, your affiant seized this gun identified as a Ruger LCP, pistol, .380 caliber semi-auto, with purple grips. CENTENO explained the compartment in the vehicle held approximately 12 to 15 pounds of drugs. CENTENO also explained Denny and Laird would drive around delivering the drugs, and he believed Denny and Laird received cash and guns in exchange for the drugs. Law enforcement was

unable to find Denny or Laird at that time; therefore, they were not arrested on March 2, 2018.

13.  On March 12, 2018, and March 16, 2018, GFPD officers applied for and received two state district court search warrants authorizing the search of all electronic media seized from the two vehicles and rooms #225 and #227 at the Extended Stay Hotel in Great Falls on March 2, 2018.

14.  Your affiant reviewed the forensic findings from one of the seized cellular phones from the hotel room where CENTENO was staying. Your affiant searched an Alcatel cellular phone, model 5049Z, identified by CENTENO as his cellular phone. During a search of the Alcatel cellular phone your affiant observed numerous Facebook (FB) messenger conversations between CENTENO, utilizing Facebook messenger account "Rollin Low" with assigned Facebook account ID "rollin.low.374," and Denny, utilizing Facebook messenger account ID "greg.denny.3." In these Facebook messenger conversations, CENTENO and Denny discussed selling drugs, getting money from previous debts, breaking the drugs up, and trading the drugs for guns. CENTENO and Denny used code words like "equipment" in reference to the drugs, "pieces of metal" in reference to the guns, "got some real estate and some good opportunities lined up" in reference to selling the drugs and "we can chop it up" in reference to breaking up the drugs.

15. Your affiant also observed Facebook messenger conversations between CENTENO, utilizing Facebook account ID "rollin.low.374," and Jennifer Castillo, utilizing Facebook account "Jennifer Castillo" with assigned Facebook account ID "JenBabeS805." In these conversations, CENTENO and Castillo discussed CENTENO purchasing a truck and then purchasing a Cadillac. Your affiant seized a white 2002 Cadillac on March 2, 2018, during the arrest of CENTENO and RAMIREZ.

16. Your affiant queried Facebook account "rollin.low.374" on an undercover Facebook account and observed images of the Dallas Cowboy's star symbol with the word Oxnard across the star. Your affiant looked on the "about" tab on this page and it showed "rollin.low.374" studied at California State University and lives in Oxnard, California. The "friends" tab on this page listed Jennifer Castillo as a friend. This Facebook account is assigned Facebook ID: "rollin.low.374".

17. On April 3, 2018, at approximately 3:16 p.m., your affiant applied for and received a Search and Seizure Warrant, Case Number MJ 18-18-GF-JTJ, through the United States District Court authorizing the search of the LG model US996 cellular phone utilized by Denny and seized from Denny pursuant to his arrest on March 29, 2018, by the Great Falls Police Department.

18. On April 3, 2018, at approximately 3:55 p.m., a forensic examination was initiated on the LG cellular phone.

19. During a search of Greg Denny's cellular phone, your affiant observed Facebook messenger conversations between Denny, utilizing Facebook account "Greg Denny" with assigned Facebook account ID "orwellian16," and Castillo, utilizing Facebook account "Jennifer Castillo" with assigned Facebook account ID "JenBabeS805." In this Facebook messenger conversations, Denny and Castillo discussed attempting to recover money owed by Denny on previous drug debts for her "boss." The conversation between Castillo and Denny occurred after the arrest of CENTENO on March 2, 2018.

20. On March 29, 2018, at approximately 10:00 a.m., your affiant issued a Preservation Request on Facebook account ID "rollin.low.374." Facebook assigned case number 1608300 to this request.

21. Based upon my training and my experience investigating drug dealers and drug transactions, I believe there is evidence of illegal drug sales on Roel CENTENO's Facebook account ID: "rollin.low.374." Drug dealers have to communicate with their clients to arrange meetings and to negotiate quantities and prices. CENTENO regularly used Facebook as a communication device and based

on the state district court search warrant on CENTENO's Alcatel cellular phone, your affiant observed numerous conversations relating to the sale of narcotics.

22. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

23. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

24. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange

communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

25. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

26. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic

11

locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

27. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

28. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These

chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

29. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

30. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

31. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

32. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

33. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

34. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

35. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

36. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly

14

with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

      37.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location

15

associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

38. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

39. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

40. Based on the forgoing, I request that the Court issue the proposed search warrant.

41. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

42. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

17

## REQUEST FOR SEALING

43. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
Albert W. Kinsey
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on April 19, 2018.

_____
HON. JOHN T. JOHNSTON
UNITED STATES MAGISTRATE JUDGE